IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| DEVIL'S ADVOCATE, LLC, *et al.*, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
|       v. | ) | Case No. 1:13-cv-1246 |
| | ) | |
| ZURICH AMERICAN INSURANCE | ) | |
| COMPANY, | ) | |
|     Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

This action grows out of negotiations between plaintiffs and defendant relating to the possibility of defendant retaining plaintiffs' services and expert testimony regarding the reasonableness of attorneys' fees claims submitted in a Texas litigation in which defendant was a party. Plaintiffs claim that these negotiations led to the formation of an enforceable contract, which defendant breached. Plaintiffs further argue that defendant's disclosure of plaintiff John Toothman's resume in the Texas litigation constituted infringement of his copyrighted resume, and that defendant's designation of Toothman as a potential expert in the Texas litigation constituted an actionable conversion of Toothman's name and reputation. Defendant denies these contentions, arguing that the parties' negotiations never resulted in an enforceable contract and that defendant's use of Toothman's resume and name in the Texas litigation constituted neither copyright infringement nor conversion.

At issue, therefore, on summary judgment, are the following questions:

(1) whether negotiations between the parties culminated in an enforceable contract;

(2) whether defendant's designation of John Toothman as a potential expert in the Texas litigation constituted conversion of his name and reputation; and

1

(3) whether defendant's disclosure of Toothman's resume infringed the copyright he claims to hold in his resume.

For the reasons that follow, summary judgment must be granted with respect to questions one and two, whereas resolution of question three must be deferred, pending further submissions of the parties.

I.

The material undisputed facts may be succinctly summarized.[1]

- Plaintiffs in this action are Devil's Advocate, LLC ("DA") and John Toothman. DA is a Virginia corporation providing consulting services, including expert witness testimony, concerning the propriety and reasonableness of attorneys' fees claims. Plaintiff John Toothman, a licensed attorney, is a Virginia resident and DA's founder and owner.

---

[1] It is important to note that the parties, pursuant to a February 6, 2014 Scheduling Order, were instructed to proceed as follows with respect to their motions for summary judgment:

> As required by Local Civil Rule 56, each brief in support of a motion for summary judgment must include a separately captioned section within the brief listing, in numbered-paragraph form, each material fact that the movant contends is undisputed with appropriate citations to the record. A brief in opposition to a motion for summary judgment must include a separately captioned section within the brief addressing, in numbered-paragraph form corresponding to the movant's section, each of the movant's enumerated facts and indicating whether the non-movant admits or disputes the fact *with appropriate citations to the record.*

*Devil's Advocate, LLC et al v. Zurich American Ins. Co.*, No. 1:13cv1246 (E.D. Va. Feb. 6, 2014) (Order) (Doc. 16) (emphasis added). Defendant, as movant, complied with this direction by separately listing each material fact it contends is undisputed with appropriate citations to the record. Although plaintiffs responded in a separately-captioned section with enumerated paragraphs corresponding to defendant's statement of undisputed facts, plaintiffs' responses are merely bald assertions that are contrary to the Scheduling Order, as plaintiffs do not cite admissible record evidence in support of any of their alleged material disputed facts. Accordingly, plaintiffs' responses to defendant's statement of undisputed facts do not create a genuine issue of material fact. *See McCreary v. Governor of Va.*, No. 3:12cv484, 2014 WL 4162202 at *2 (E.D. Va. Aug. 19, 2014) ("[Plaintiff's] failure to submit admissible evidence permits the Court to rely solely on the submissions of Defendants in deciding the Motion for Summary Judgment."); *Haas v. Falmouth Fin., LLC*, No. 1:10cv565, 2011 WL 10603202 at *1 n.1 (E.D. Va. Jan. 14, 2011) (assertions not supported by admissible evidence are properly disregarded on a motion for summary judgment).

- Defendant Zurich American Insurance Company is an insurance company with its principal place of business in New York.  Defendant is authorized to do business in Virginia.

- On October 12, 2010, Blair Dancy, Esq., an attorney representing defendant, contacted Toothman on behalf of defendant concerning the possibility of Toothman serving as an expert witness on the reasonableness of attorneys' fees in an insurance coverage dispute filed in Texas by Sterling Chemicals, Inc. captioned *Sterling Chemicals, Inc. v. Zurich American Insurance Co., et al.*, Cause No. 2008-09808 (234th Jud. Dist. Ct., Harris City, Tex.).

- That same day, October 12, 2010, Toothman sent Dancy an email confirming his availability to serve as an expert witness in the case.  Toothman attached to the email a copy of a Billing Agreement form (hereinafter "Billing Agreement"), a copy of his resume, and information about DA's services.

- The Billing Agreement form Toothman sent Dancy left certain terms blank. Specifically, the form stated: "Our flat fee for this engagement is $_____, which is _____ Percent (_____%) of the gross amount of all fees and expenses we review (estimated to be at least $_____), to prepare a preliminary written or oral report."

- The Billing Agreement form also stated that half of the flat fee is earned once DA "[is] retained or begin[s] work, upon use of our name, upon disclosure of our retention, or upon resolution of the dispute, whichever comes first."

- On November 2, 2010, Dancy emailed Toothman about some legal bills submitted to defendant by Sterling.  In this email, Dancy asked Toothman to provide a proposal for costs associated with DA's review of these expense bills. Specifically, Dancy stated that "Our client Zurich American Insurance Company has requested that our firm get a proposal from you in regard to the review of, and potential expert-witness work in relation to, defense expenses involving two firms, submitted by Sterling Chemicals, Inc. . . ."

- On November 3, 2010, Toothman responded by emailing Dancy a "Confidential Proposal" which stated: "Assuming we review at least $4 million in bills (fees and expenses) and the bill formats are consistent with the sample bill you provided, we are quoting a fee for your project of 2.1 % of the gross amount of the fees we would review and report upon."  The Confidential Proposal also noted: "This proposal is preliminary, prior to our engagement and full review of available information."

- In a November 4, 2010 email, Dancy advised Toothman that he had received the November 3 Confidential Proposal and that defendant was "mulling it over."

3

- On November 8, 2010, Toothman again emailed Dancy to ask whether Dancy had heard back from defendant regarding the November 3 Confidential Proposal.

- Thereafter, and within a few days of receiving the proposal, Dancy communicated by telephone to Toothman that defendant had rejected the terms of the November 3 Confidential Proposal.[2] Dancy mentioned two reasons for the rejection of the proposal: "one it was too high and second [for] any sort of proposal structured like this, we would need to be sure that we could get past the late designation issue."[3]

- In the same telephone call, Dancy, discussing the possibility of Toothman serving as an expert witness in the Texas litigation, said "two things . . . needed to happen. One was that we had to negotiate reasonable terms that [defendant] was going to agree to and the second was we needed permission of the court to bring [Toothman] in past the designation deadline, since the designation deadline had passed."[4]

- On November 16, 2010, Dancy emailed Toothman to let him know that the judge in the Texas litigation had unilaterally continued the trial, and that all pending motions were "carried," meaning that all pending motions were continued.

- On November 19, 2010, Dancy served opposing counsel in the Texas litigation with an Amended Designation of Expert Witness, listing Toothman as one of defendant's experts.

- That same day—November 19, 2010—Toothman emailed Dancy, writing "Just checking in. I'm assuming this may be shut down for some time, but the more time we can spend on the review, the better."

---

[2] *See* Deposition of Blair Dancy at 114:19-115:1 ("Q. [W]hen did [defendant] reject Devil's Advocate's proposal? . . . A. I'm not sure of the exact day, but it would have been a phone call within probably a few days of receiving the early November 2010 proposal.").

[3] Deposition of Blair Dancy at 102:2-7.

[4] *See* Deposition of Blair Dancy at 84:9-17. In their opposition brief, plaintiffs assert that this telephone conversation never occurred. Plaintiffs, however, fail to create a factual dispute on this issue because their assertion is unsupported by record evidence. *See* note 1, *supra.* Additionally, plaintiffs' claim is undermined by Toothman's own deposition testimony, where he conceded that Dancy rejected plaintiffs' offer on behalf of defendant. *See* Deposition of John Toothman at 65:25-66:3 ("[H]e told me that [defendant] wanted to pay less. I asked him how much. He indicated it was a small amount, so we talked about reducing the fee slightly.").

- On December 2, 2010, while discussing his potential retention in the Texas litigation, Toothman emailed Dancy regarding a potential conflict Toothman might have with two attorneys, stating: "I'll be careful, if I ever get hired."

- On December 3, 2010, Dancy filed an Amended Motion for a Rule 166 Pretrial Conference with the Texas court, which included defendant's Amended Designation of Expert Witness. This designation specified the topics on which the experts might testify, but also stated that no expert opinions were available.

- On December 8, 2010, Toothman sent Dancy an email warning Dancy that "naming me as a witness before we [are] retained is likely to cause us some issues," and also stated that "I'll hold the week before and the week of the April 18 trial once we get retained."

- During his deposition, Toothman elaborated on the issues he referenced in the December 8, 2010 email: "Naming me, just saying my name as though I [was] their – [defendant's] witness, when I *hadn't even been hired or done any work yet*. It's not how it's normally done. It's not how it's ever done."[5]

- On December 13, 2010, Toothman emailed Dancy and stated that "in case this thing goes forward," the total amount of fees to review was just under $3.5 million, instead of the $4 million originally estimated.

- On December 14, 2010, Dancy emailed Toothman to inform Toothman that a hearing originally scheduled for December 15 was moved to January 3 because opposing counsel's mother had died the previous weekend. In response, Toothman wrote back, in relevant part, "is there any way to make sure [that defendant is] ready to go right after the hearing, e.g. by approving our agreement and cutting the initial check?"

- On December 29, 2010, Toothman emailed Dancy again and stated, "Attached is the paperwork to get this process going once you decide what to do . . . We should start as soon as we receive the signed agreement and initial payment."

- "[T]he paperwork" attached to Toothman's December 29, 2010 email was another Billing Agreement (hereinafter "Amended Billing Agreement") listing, for the first time, a flat fee of $69,233.82. That figure was based on DA reviewing 2.0 % of the gross amount of fees and expenses in the underlying litigation, estimated to be at least $3.4 million.

- On January 13, 2011, Toothman emailed Dancy and stated, "Payment of the full fee was triggered when [defendant] designated me as its expert on December 3, 2010." Attached to this email was an invoice for $34,616.91.

---

[5] *See* Deposition of John Toothman at 158:23-159:1 (emphasis added).

- On January 17, 2011, Dancy, on behalf of defendant, removed Toothman's name from defendant's expert witness designation in the Texas litigation. That same day, Dancy sent Toothman a letter informing him that "[g]iven the fact that we no longer believe we can have the kind of working relationship with you that would be required in these circumstances, we have de-designated you as a potential expert in this case."

- The same January 17, 2011 letter also noted that: "We [defendant] had intended to try to address your stated concerns this morning, however, you unilaterally terminated my call for the second time and did not want to discuss it."

Plaintiffs filed this action on October 7, 2013, alleging claims for breach of contract, unjust enrichment, conversion, violation of Va. Code § 8.01-40, trademark infringement, and copyright infringement. On May 16, 2014, an Order issued in this case dismissing the claims for (1) unjust enrichment, (2) violation of Va. Code § 8.01-40, (3) trademark infringement, (4) copyright infringement except insofar as this claim is based on the alleged unauthorized copying or reproduction of Toothman's resume, and (5) conversion except insofar as this claim is based on the alleged conversion of Toothman's name and reputation. *Devil's Advocate, LLC et al. v. Zurich American Ins. Co.*, No. 1:13cv1246 (E.D. Va. May 16, 2014) (Order) (Doc. 24). Thus, after the May 16, 2014 Order, plaintiff's remaining claims are (1) breach of contract, (2) conversion of Toothman's name and reputation, and (3) copyright infringement of Toothman's resume.

## II.

The summary judgment standard is too well-settled to merit extended discussion, and the parties do not dispute this standard. Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56, Fed. R. Civ. P. It is settled that "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence

of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986).  On the other hand, a genuine factual dispute exists "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*,

*Inc.*, 477 U.S. 242, 248 (1986).  Importantly, the party opposing summary judgment may not rest

upon mere allegations and denials, and must instead "set forth specific facts showing that there is

a genuine issue for trial." *Id.*  And "[t]he mere existence of a scintilla of evidence in support of

the [non-moving party's] position will be insufficient; there must be evidence on which the jury

could reasonably find for the [non-moving party]." *Id.* at 252.

Defendant argues that (i) there is no genuine issue of material fact with respect to

plaintiffs' breach of contract claim because no enforceable contract was ever formed between

plaintiffs and defendant, (ii) no conversion occurred as Toothman, by his actions, impliedly

consented to the use of his name for designation purposes, and (iii) no copyright infringement

occurred, *inter alia*, as defendant's use of Toothman's resume constituted fair use pursuant to 17

U.S.C. § 107.  Each of these arguments is separately addressed.

### III.

### A.

Under Virginia law, a plaintiff seeking to recover for a breach of contract claim must

prove the following:

> (1) a legally enforceable obligation of a defendant to a plaintiff;
>
> (2) defendant's breach of that obligation; and
>
> (3) injury to the plaintiff caused by the breach of the obligation.

*Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004).  For a contract to be a legally enforceable

obligation, "there must be mutual assent of the contracting parties to terms reasonably certain

7

under the circumstances." *Allen v. Aetna Cas. & Sur. Co.*, 281 S.E.2d 818, 820 (Va. 1981); *see also Va. Power Energy Mktg., Inc. v. EQT Energy, LLC*, No. 3:11cv630, 2012 WL 2905110 at *4 (E.D. Va. July 16, 2012). Mere "agreements to agree in the future" are "too vague and too indefinite to be enforced." *W.J. Schafer Assoc's., Inc. v. Cordant, Inc.*, 493 S.E.2d 512, 515 (Va. 1997). In considering whether an agreement is a binding contract or merely an agreement to agree in the future, courts evaluate whether the document at issue includes the requisite essential terms and also whether the conduct of the parties and the surrounding circumstances evince the parties' intent to enter into a contract. *See High Knob v. Allen*, 138 S.E.2d 49, 52-53 (Va. 1964). Thus, a critical difference between a contract and an agreement to agree in the future is whether the record reflects a meeting of the parties' minds on essential material terms. *See Moorman v. Blackstock, Inc.*, 661 S.E.2d 404, 409 (Va. 2008) ("Perhaps most importantly, mutuality of assent—the meeting of the minds of the parties—is an essential element of all contracts.") (internal quotation marks and citations omitted); *Phillips v. Mazyck*, 643 S.E.2d 172, 175 (Va. 2007) ("It is elementary that mutuality of assent—the meeting of the minds of the parties—is an essential element of all contracts.") (internal quotation marks and citations omitted). Thus, a valid contract for services must contain terms that are "certain and definite as to the nature and extent of service to be performed, the place where and the person to whom it is to be rendered, and the compensation to be paid, or it will not be enforced." *Mullins v. Mingo Lime & Lumber Co.*, 10 S.E.2d 492, 494 (Va. 1940). If an alleged agreement "does not establish an explicit amount of compensation or a sufficiently definite method for calculating payment," then it is not enforceable as a contract. *McKay Consulting v. Rockingham Mem'l Hosp.*, No. 5:09cv00054, 2010 WL 3200061 at *7 (W.D. Va. Aug.11, 2010).

Additionally, under Virginia law, acceptance of sufficiently definite terms is necessary for contract formation and the terms of the acceptance must be identical to the terms of the offer. *See Rotella v. Lange*, 118 S.E.2d 516, 519 (Va. 1961); *see also Epius Tech, Inc. v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 758, 761 (E.D. Va. 2005). Thus, an "acceptance that varies the terms of the offer is a counteroffer which rejects the original offer." *Princess Cruises, Inc. v. Gen. Elec. Co.*, 143 F.3d 828, 834 (4th Cir. 1998). Indeed, it is "elementary that in order to form a contract, there must be no variance between the acceptance and the offer." *Yosco v. Aviva Life and Annuity Co.*, 753 F. Supp. 2d 607, 610 (E.D. Va. 2010). Hence, an acceptance in terms that materially vary from an offer is not an acceptance. These principles, applied to the undisputed facts in the record, point convincingly to the conclusion that the parties' words and actions in their negotiations fell far short of creating an enforceable contract.

Plaintiffs' argument, distilled to its essence, is that an enforceable contract was created when defendant, on November 19, 2010, served opposing counsel with an Amended Designation of Expert Witness in the Texas litigation that designated Toothman as a potential expert, thereby accepting plaintiffs' offer contained in the October 12 Billing Agreement form, with blanks, augmented by the November 3 Confidential Proposal. This argument founders on the facts. To begin with, the October 12 Billing Agreement form, by itself, cannot serve as an offer capable of acceptance; it is fatally indefinite as it leaves blank both the fee term and the percentage DA was to collect based on the dollar amount of fee claims to be reviewed in the Texas litigation. Blank material terms are prototypical characteristics of an unenforceable contract. *See Mullins*, 10 S.E.2d at 494. Plaintiffs do not argue otherwise. Instead, plaintiffs assert that the October 12 Billing Agreement form with blanks, when combined with the November 3 Confidential Proposal, constituted a sufficiently definite offer that was capable of being accepted. This

9

argument also founders on the facts. First, it is worth noting that the November 3 Confidential Proposal specifically notes that it is "preliminary, prior to [DA's] engagement and full review of available information." This plainly suggests that this proposal was no more than a preliminary proposal with a more definite proposal to await additional information. Indeed, precisely this occurred; the undisputed facts reflect that even plaintiffs did not intend to be bound by the November 3 Confidential Proposal, inasmuch as the Amended Billing Agreement plaintiffs sent on December 29 contained terms materially different from the terms stated in the November 3 Confidential Proposal.[6] Thus, the October 12 Billing Agreement form with blanks, even when coupled with the November 3 Confidential Proposal, cannot reasonably be viewed as a definite offer that plaintiffs, let alone defendant, considered binding.

In any event, even assuming the October 12 Billing Agreement form with blanks coupled with the November 3 Confidential Proposal was an adequately specific offer to which plaintiffs intended to be bound, the record flatly refutes any claim that defendant accepted this offer. The record reflects that after receiving the October 12 Billing Agreement form with blanks and the November 3 Confidential Proposal, Dancy, in a telephone conversation a few days later,[7] unequivocally told Toothman that the terms of the offer were not acceptable to defendant. Specifically, Dancy, in his deposition, made clear that he advised Toothman that neither the October 12 Billing Agreement form with blanks nor the November 3 Confidential Proposal were

---

[6] The December 29 Amended Billing Agreement includes a flat fee quote of $69,233.82, estimated to be 2 % of the gross amount of all fees and expenses to be reviewed—at least $3.4 million. By contrast, the earlier November 3 Confidential Proposal anticipated a 2.1% fee, assuming $4 million in expenses and fees were reviewed, deviating from the 2 % fee and $3.4 million in expenses and fees quoted in the Amended Billing Agreement.

[7] *See* Deposition of Blair Dancy at 114:19-115:1 ("Q. [W]hen did [defendant] reject Devil's Advocate's proposal? . . . A. I'm not sure of the exact day, but it would have been a phone call within probably a few days of receiving the early November 2010 proposal.").

"acceptable as a general matter," and he also told Toothman that the terms of the November 3 Confidential Proposal were "too high."[8] Nor is there any doubt that Toothman understood that defendant did not accept plaintiffs' offer. Indeed, on November 8, Toothman acknowledged that defendant had not yet accepted the terms of the November 3 Confidential Proposal by asking Dancy if there was "[a]ny word from [defendant]" after being informed that defendant was "mulling [the proposal] over."[9] Almost a month later, on December 2, Toothman emailed Dancy to discuss potential conflicts with two attorneys, and in that email mentioned: "I'll be careful, *if I ever get hired*,"[10] further demonstrating that even in early December, Toothman knew defendant had not yet accepted plaintiffs' offer. Finally, on December 8, nearly one full week later, Toothman emailed Dancy that defendant's disclosure of Toothman as a potential witness in the Texas litigation to opposing counsel—which occurred on November 19—*before he was retained* was likely to cause issues, as Toothman had not yet done any work on behalf of defendant.[11] Thus, the undisputed record evidence reflects that defendant considered and rejected plaintiffs' offer.

Nor can plaintiffs plausibly contend that defendant's designation of Toothman as a potential expert in the Texas litigation constituted an acceptance. The record reflects the contrary conclusion, namely that Toothman knew, after learning of his designation in the Texas litigation on November 19, that he had not yet been formally retained. As noted earlier, on

---

[8] *See* Deposition of Blair Dancy at 113:7-11; *id.* at 102:2-7. Plaintiffs' conclusory allegation that this rejection never occurred is undermined by clear record evidence from Toothman's own deposition. *See* note 4, *supra*.

[9] *See* Defendant's Memorandum in Support of its Motion for Summary Judgment (Doc. 28), Ex. 5.

[10] *Id.*, Ex. 11 (emphasis added).

[11] *Id.*, Ex. 13; *see also* Deposition of John Toothman at 158:23-159:1.

December 2—two weeks after Toothman was included on defendant's Amended Designation of Expert Witness—Toothman emailed Dancy, stating "I'll be careful, *if I ever get hired*."[12] Similarly, Toothman, in his deposition and in conjunction with his December 8 email he sent Dancy, discussed the issues he believed were presented when defendant disclosed him as a potential expert witness in the Texas litigation: "[n]aming me, just saying my name as though I [was] their–[defendant's] witness, when *I hadn't even been hired or done any work yet*. It's not how it's normally done. It's not how it's ever done."[13]  Subsequently, on December 14, nearly two weeks after Dancy included Toothman's name in an Amended Motion for a Rule 166 Pretrial Conference with the Texas court on December 3, Toothman emailed Dancy, asking if there was "any way to make sure [that defendant is] ready to go right after the hearing . . . by *approving our agreement* and cutting the initial check".[14]  Thus, the undisputed summary judgment record is clear that both parties understood that the disclosure of Toothman as an expert on November 19 to opposing counsel was a necessary first step in receiving court approval for Toothman to testify, instead of an acceptance by defendant of any alleged offer. Finally, to the extent plaintiffs attempt to rely on the December 29 Amended Billing Agreement as a basis for a contract, there is clearly no evidence that defendant ever accepted the terms of this document.[15]  In response to receiving the December 29 Amended Billing Agreement and

---

[12] *Id.*, Ex. 11 (emphasis added).

[13] Deposition of John Toothman at 158:23-159:1 (emphasis added).

[14] Defendant's Memorandum in Support of its Motion for Summary Judgment (Doc. 28), Ex. 15 (emphasis added).

[15] Plaintiffs do not rely on the Amended Billing Agreement for their breach of contract claim, asserting "there was already an agreement." *See* Plaintiffs' Opposition to Zurich's Motion for Summary Judgment (Doc. 60) at 19.  Moreover, any attempt by plaintiffs to rely on the

attached invoices, Dancy wrote a letter indicating that Toothman had "unilaterally terminated" a

telephone call where Dancy indicated defendant's disagreement with the terms of the December

29 Amended Billing Agreement, and that as a result, Toothman was de-designated as a *potential*

expert.[16]

In sum, the undisputed material facts establish that:

(1) The October 12 Billing Agreement form with blanks omits material contract terms and is hence not a valid offer capable of being accepted;

(2) The October 12 Billing Agreement form with blanks coupled with the November 3 Confidential Proposal was clearly intended by plaintiffs to be a preliminary proposal and is therefore not a definite offer;

(3) Even assuming, *arguendo*, that the October 12 Billing Agreement form with blanks combined with the November 3 Confidential Proposal is a sufficiently definite offer, the record is clear that defendant did not accept this offer; and

(4) Defendant's designation of Toothman as a potential expert in the Texas litigation was not an acceptance of plaintiffs' offer and indeed, plaintiffs themselves recognized that the designation of Toothman, by itself, was not an acceptance of their offer.

**B.**

Plaintiffs also claim that defendant converted Toothman's name and reputation by

designating Toothman as a potential expert in the Texas litigation and disclosing his name to the

Texas court and opposing counsel.  Under Virginia law, a plaintiff seeking to recover for

conversion must prove: (i) ownership or right to possession of the property at the time of the

conversion, and (ii) the wrongful exercise of dominion or control by defendant over the

plaintiff's property, thus depriving plaintiff of possession.  *Economopoulous v. Kolaitis*, 528

---

Amended Billing Agreement to establish a contract would fail, as there is no evidence defendant ever accepted the terms of this document.

[16] *See* Defendant's Memorandum in Support of its Motion for Summary Judgment (Doc. 28), Ex. 18 (emphasis added).

S.E.2d 714, 719 (Va. 2000). As an initial matter, it is well-settled that Toothman has a valid proprietary right in his own name: "In Virginia, one holds a property interest in one's name and likeness" and thus a name "can[] be converted."[17] *Town & Country Prop's, Inc. v. Riggins*, 457 S.E.2d 356, 363-64 (Va. 1995). Thus, Toothman's name is "property" for the purposes of plaintiffs' conversion claim.

Significantly, when a party consents to the use of his or her property, an action for conversion cannot be maintained. This is so because "the element of wrongful exercise of dominion or control cannot be established" when a party grants permission to another to possess the property at issue in a conversion claim. *Williams v. Reynolds*, No. 4:06cv00020, 2006 WL 3198968 at *3 (W.D. Va. Oct. 31, 2006) (internal citations omitted). *See also Adkins v. Crown Auto, Inc.*, No. 4:04cv00042, 2005 WL 1278948 at *4 (W.D. Va. May 27, 2005) (granting summary judgment on a claim for conversion of a car because defendant's lawful possession of the car precluded a finding of wrongful exercise of dominion or control).

The parties dispute whether Toothman consented to defendant's use of his name. Defendant contends that Toothman authorized the use and disclosure of his name, which necessarily defeats plaintiffs' conversion claim. Plaintiffs disagree, arguing there is at least a genuine issue of material fact as to whether plaintiffs consented to the use of Toothman's name. Defendant does not claim that Toothman expressly consented to the use of his name, arguing instead that the undisputed summary judgment record shows that Toothman impliedly consented

---

[17] Although plaintiffs appear to assert a conversion claim on behalf of both DA and Toothman, in the course of the final pre-trial conference, it became clear that the conversion claim can only belong to Toothman. *See Devil's Advocate, LLC, et al. v. Zurich American Ins. Co.*, No. 1:13cv1246 (E.D. Va. May 15, 2014) (Reporter's Transcript, Pre-Trial Conference) (to be docketed).

to the disclosure of his name, and hence, summary judgment must be granted on plaintiffs' conversion claim.

Implied consent is a well-recognized bar to conversion claims. *See, e.g., Kewanee Private Utilities Co. v. Norfolk Southern Ry. Co.*, 88 S.E. 95, 99 (Va. 1916) (ratification of defendant's actions "precluded plaintiff from recovering from the defendant for conversion").[18] This principle is well-illustrated in the Ninth Circuit's decision in *Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902 (9th Cir. 2008). There, the Ninth Circuit affirmed the district court's judgment after a bench trial in favor of defendant on plaintiff's claim for conversion because the plaintiff, Bank of New York, was aware of money transfers which formed the basis of its conversion claim and did not protest or object to the transfers. *Id.* at 914-15. In reaching this conclusion, the Ninth Circuit offered a helpful example of implied consent as a bar to conversion. Specifically, it noted that in a situation where a claimant watched another party make multiple trips to the claimant's land and remove truckloads of sand, rock, and gravel, the claimant was then precluded from bringing a conversion claim. *Id.* at 914. This is so because the claimant's behavior—passively watching and thereby becoming aware of the other party's possession of the claimant's property—meant that the claimant "impliedly assent[ed] to or ratif[ied] the taking, use or disposition of plaintiff's property." *Id.* The Restatement (Second) of Torts, which is followed in Virginia,[19] also embodies this tort principle: "Consent is willingness

---

[18] *See also Chemical Sales Co., Inc. v. Diamond Chemical Co., Inc.*, 766 F.2d 364, 369 (8th Cir. 1985) ("The defense of implied consent or ratification follows from the definition of conversion as an *unauthorized* assumption of the right of ownership.") (internal quotation marks and citations omitted); *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 904 F. Supp. 818, 821 n.2 (N.D. Ill. 1995) ("[C]onsent may be implied by silence where a reasonable person would speak if objecting . . . Consent, however is a *defense* to a charge of conversion.").

[19] *See, e.g., Kellermann v. McDonough*, 684 S.E.2d 786, 791 (Va. 2009).

in fact for conduct to occur. It may be manifested by action or inaction and need not be communicated to the actor." *Id.*, § 892 (1).

Given these governing principles, the question presented here is whether the undisputed record establishes that plaintiffs impliedly or implicitly consented to or ratified defendant's use of Toothman's name in the Texas litigation. This question must be answered in the affirmative; indeed, the undisputed summary judgment record establishes precisely this. Thus, there is no doubt that Toothman was aware that defendant disclosed his name to the court and opposing counsel in the Texas litigation as a potential expert. There is similarly no doubt that Toothman, despite this knowledge, did not protest or object to this disclosure, nor did he request removal of his name from defendant's designation in the Texas litigation. Specifically, following defendant's designation of Toothman on November 19 to opposing counsel, approximately two-and-a-half weeks later on December 8, Toothman wrote to Dancy: "[n]aming me as a witness before we [are] retained is likely to cause us some issues . . . ."[20] Clearly, therefore, Toothman knew and implicitly consented to the disclosure of his name.[21] Indeed, despite knowing his name was included in defendant's amended designation filed in the Texas litigation, Toothman, on December 29, sent Dancy an email with a new Billing Agreement in order "to get this project going *once you decide what to do*."[22] Toothman also noted that DA "[would] start as soon as [it] receive[d] the signed agreement and initial payment."[23] In other words, on December 29, almost

---

[20] *See* Defendant's Memorandum in Support of its Motion for Summary Judgment (Doc. 28), Ex. 13. The "issues" Toothman referred to in his email involved potential conflicts with two attorneys.

[21] *Id.*

[22] *Id.*, Ex. 16 (emphasis added).

16

six weeks after Toothman was initially aware of the use of his name in the Texas litigation, he *still* did not protest the use of his name in defendant's amended designation.  A clearer case of implied consent or ratification is difficult to imagine.

Plaintiffs' only response to these clear facts is to cling to their argument that Toothman never *expressly* permitted the use and disclosure of his name, and to surmise that defendant disclosed Toothman's name to increase defendant's leverage in potential settlement negotiations in the Texas litigation.  Neither response refutes the facts in this case that establish implied consent or ratification.  As to the first portion of this argument, plaintiffs' definition of consent is too restrictive, as a finding of implied consent is proper where, as here, the record is clear that the relevant party was aware of the alleged incursion on his or her property, and nevertheless took no affirmative steps to register any objection or stop the alleged conversion. *See Kewanee*, 85 S.E. at 99.  Notably, plaintiffs cite no record evidence to contradict the facts that constitute implied consent.  Instead, plaintiffs rely on their assertion that "DA does not allow its name or resume to be used in this fashion precisely because of situations like this, where the name and resume would be abused for purposes of gaining leverage in settlement."[24]  This, too, does not refute the facts which establish implied consent.  And plaintiffs' reliance on defendant's supposed motivation for its disclosure of Toothman's name simply has no bearing on Toothman's implied consent, even if true.[25]  Thus, because the undisputed summary judgment record is clear that Toothman knew of, and acquiesced in, the disclosure of his name in the Texas

---

[23] *Id.* (emphasis added).

[24] *See* Plaintiff's Opposition to Zurich's Motion for Summary Judgment at 22.

[25] Although unclear on this record, it appears the settlement in the Texas litigation occurred *after* defendant removed Toothman's name from defendant's amended expert designation, severely undermining plaintiffs' assertion that disclosure of Toothman's name increased defendant's settlement leverage.

litigation, plaintiffs' conversion claim fails as no reasonable factfinder could conclude on this record that Toothman did not give implied consent for the use of his name.

C.

Plaintiffs' remaining claim of copyright infringement focuses ostensibly on Toothman's resume. Because it is unclear whether plaintiffs have a valid copyright that extends to Toothman's resume, resolution of this issue must be deferred, pending further submissions by the parties on this point.[26]

A plaintiff seeking to prove infringement of a copyright must show (1) ownership of a valid copyright and (2) copying of the constituent elements of the work that are original. *Feist Publ's, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). A certificate of copyright registration is credible evidence of copyright validity, as "[t]he submission of a valid certificate of copyright registration creates a presumption of originality for five years from the date of recognition." *Universal Furniture Int'l Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 430 (4th Cir. 2010). However, this presumption is "fairly easy to rebut because the Copyright Office tends toward cursory issuance of registrations." *Id.* Defendant claims that plaintiffs' valid Copyright Certificate does not protect Toothman's resume, pointing out that plaintiffs' complaint

---

[26] In their complaint, plaintiffs allege that defendant's amended expert designation filed in the Texas litigation infringed DA's copyright in the Confidential Proposal form in its entirety, including Toothman's resume. The portion of the claim based on the allegation that defendant's amended expert designation infringed the copyright in the Confidential Proposal form was dismissed by an Order issued in this case on May 16, 2014, on the ground that the record was clear that the amended expert designation, by itself, was not substantially similar to the Confidential Proposal form. *See Devil's Advocate, LLC, et al. v. Zurich American Ins. Co.*, No. 1:13cv1246 (E.D. Va. May 16, 2014) (Order) (Doc. 24). Plaintiffs' copyright infringement claim with respect to Toothman's resume, on the other hand, survived because defendant used an exact copy of Toothman's resume. *See Devil's Advocate, LLC, et al. v. Zurich American Ins. Co.*, No. 1:13cv1246 (E.D. Va. May 15, 2014) (Reporter's Transcript, Pre-Trial Conference) (to be docketed).

18

specifically lists "DA's proposal and agreement (Exhibits A & B)" as "original copyrighted works," but does not separately list Toothman's resume as a protected work.[27]  Plaintiffs, meanwhile, maintain that Toothman's resume is part of the November 3 Confidential Proposal, falling under the umbrella of its copyright protection, and that they did not include Toothman's resume in Exhibits A and B to their complaint to avoid unnecessary duplication, given the inclusion of Toothman's resume in Exhibit C to plaintiffs' complaint.

A copyright is registered when "the Register of Copyrights determines that, in accordance with the provisions of this title [Title 17], the *material* deposited constitutes copyrightable subject matter . . . ." 17 U.S.C. § 410 (emphasis added).  Thus, Toothman's claim of copyright protection for his resume necessarily depends upon whether he submitted his resume along with the November 3 Confidential Proposal in his initial copyright application.[28] The record suggests that this did not occur.  Neither the October 12 Billing Agreement form with blanks nor the November 3 Confidential Proposal refers to the resume, attaches the resume, or incorporates the resume's contents.  And the Certificate does not mention Toothman's resume either; rather, the Certificate refers only to "Devil's Advocate Confidential Proposal."  Thus, there is no indication in the current record that DA's Certificate covers Toothman's resume.  If this is so, summary judgment is warranted on plaintiffs' copyright infringement claim on this ground, if not others.[29]  Given this, it is appropriate to give the parties an opportunity to address

---

[27] Complaint, Doc. 1, ¶ 42.

[28] *Cf. Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998) (holding that if deposit copies of a work accompanying an application for registration are not accurate copies of the work for which registration is sought, then the registration is invalid).

[29] Defendant's alleged copying may also be protected by the fair use defense and the *de minimis* doctrine, both of which may be dispositive of plaintiffs' copyright infringement claim, but neither issue needs to be reached or decided at this time.

this issue and defer ruling on plaintiffs' copyright infringement claim relating to Toothman's resume.

## IV.

In sum, because there is no genuine issue of material fact with respect to plaintiffs' breach of contract and conversion claims, defendant is entitled to summary judgment on both of these claims. As noted, a ruling on plaintiffs' copyright infringement claim is appropriately deferred, pending the parties' submission of evidence regarding whether Toothman's resume is protected under DA's Copyright Certificate.

An appropriate order will issue.

Alexandria, VA
October 10, 2014

_____
T. S. Ellis, III
United States District Judge